# Illinois Official Reports

## Supreme Court

***People v. McDonald*, 2016 IL 118882**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. STANLEY McDONALD, Appellant. |
| Docket No. | 118882 |
| Filed | December 15, 2016 |
| Rehearing denied | January 23, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District, heard in that court on appeal from the Circuit Court of Cook County, the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Patricia Mysza, Deputy Defender, and Deborah Nall, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Heather Fahrenkrog, Assistant State's Attorneys, of counsel), for the People. |

Justices

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas and Theis concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justices Freeman and Kilbride.

Justices Burke, Freeman, and Kilbride dissented upon denial of rehearing.

## OPINION

¶ 1     Defendant, Stanley McDonald, was convicted in the circuit court of Cook County of the first degree murder of his boyfriend, Lawrence Gladney. The incident took place in May 2004 during a physical altercation between defendant and Gladney, who lived together in an apartment on West 111th Street in Chicago. Defendant was initially tried in 2007 and was convicted of first degree murder. That conviction was overturned on appeal due to an erroneous jury instruction and the cause remanded for a new trial. *People v. McDonald*, 401 Ill. App. 3d 54 (2010). In February 2012, defendant was tried for first degree murder a second time and convicted. The trial court instructed the jury on second degree murder, unreasonable belief in self-defense, but declined to give instructions on second degree murder due to serious provocation or involuntary manslaughter. The trial court sentenced defendant to 27 years' imprisonment. The appellate court affirmed, finding that the trial court did not abuse its discretion in refusing the tendered instructions. 2014 IL App (1st) 121009-U. This court granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Mar. 15, 2016).

¶ 2                                    BACKGROUND

¶ 3     At defendant's trial, paramedic Luis Ponce de Leon testified that on the evening of May 16, 2004, he and his partner responded to an emergency at 337 West 111th Street in Chicago. There, he observed the victim, identified as Lawrence Gladney, lying on the ground in the backyard of the residence. His face was covered in blood, and there was a very large laceration to the right side of his face. The paramedics could smell alcohol on Gladney's breath, and they observed needle track marks indicating drug use. Gladney was bleeding profusely and was very combative as the paramedics attempted to treat him. By the time they arrived at the hospital, Gladney had lost approximately half his blood volume.

¶ 4     The testimony of Dr. Gerald Lemole, a neurosurgeon, was presented by stipulation. He testified that two days after admission to the hospital, Gladney had a massive stroke. The stroke occurred as a result of the stab wound to Gladney's right cheek, which had damaged the carotid artery and caused a blood clot to form. Dr. Lemole performed surgery to remove some bone from Gladney's skull to relieve the swelling of his brain. However, the pressure in his brain continued to increase.

¶ 5     Dr. Nancy Jones, Cook County chief medical examiner, performed an autopsy on Gladney. She found three stab wounds on his body. There was a stab wound on the right side of his face

that was about two inches long. Another stab wound was located on the left side of Gladney's chest, and that one was about one inch in length. The third stab wound was to his left upper arm and also measured one inch in length. The wounds to the chest and arm were superficial in that they did not go into the body cavity but were confined to tissue and muscle under the skin. The wounds to the face and chest were both downward wounds, indicating that the knife came down from above Gladney's body. Gladney also had abrasions on his left arm and both legs. With respect to the facial wound, Dr. Jones testified that for the carotid artery to be involved, the knife would have to go through facial bones, down and toward the center of the body. Gladney died of multiple stab wounds, and the manner of death was homicide. Dr. Jones further testified that if someone were aiming to cut the carotid artery, he would aim for the neck, rather than the face.

¶ 6     Charlotte Davis, defendant's cousin, testified that on May 16, 2004, she lived in the basement of the house on West 111th Street. The basement was divided into two sections. She and her boyfriend, Calvin Holliday, lived in one section, and defendant and Gladney lived in the other section. When she saw defendant on that day, he was upset and angry because Gladney had been gone all day. He said he was going to "get" Gladney when he got home. He also said he was going to kill Gladney. When he said these things, defendant had a knife in his hand. Defendant thought Gladney was having an affair.

¶ 7     At around 10 that evening, Gladney came home. Davis was standing by the back door in the main part of the house when she heard Gladney and defendant arguing in the backyard. Gladney had his bicycle, and he and defendant were arguing over it. Davis went outside to see what was happening. She observed both men standing at the top of the stairs leading to the basement. She did not see what happened at the beginning of the argument. She saw defendant try to pull the bicycle downstairs and Gladney standing further up and pulling the bicycle in the opposite direction. She heard Gladney say "ugh" and put his hand to his right eye. Blood was running down his face. Davis's mother called the police.

¶ 8     Davis testified that she did not see Gladney hit defendant. She acknowledged testifying before the grand jury and during defendant's previous trial, where she testified that Gladney hit or may have hit defendant during the struggle over the bicycle. Davis identified the knife that defendant had in his hand on the day of the incident. Davis testified to a previous incident between defendant and Gladney on New Year's Eve in 2003, when defendant cut Gladney on the head with a knife during an argument.

¶ 9     Calvin Holliday testified that around 9 a.m. on the day of the incident, he drank a few beers with defendant, who was upset due to an argument between him and Gladney. Defendant had a knife, and he told Holliday that he was going to kill Gladney. Later, Holliday went to a liquor store. He saw Gladney, and they shared some wine. They both went back to the house. Defendant was there, and he and Gladney talked. On direct examination, Holliday acknowledged that he testified before the grand jury that when Gladney came home the first time, defendant still had the knife and that he pointed it at Gladney, saying he was going to kill Gladney that day. On cross-examination, Holliday testified that when Gladney came home the first time, defendant and Gladney talked, and there was no fighting at that time.

¶ 10     Holliday testified that Gladney left and came home again in the evening around 10. Holliday was on the phone with his sister. Davis came into the house yelling. Holliday went outside and saw Gladney lying on the ground with defendant on top of him, saying "please

don't die." Defendant had a knife in his hand. Holliday acknowledged that during his grand jury testimony, he said that Gladney was "bloody everywhere" and that defendant asked him to help Gladney.

¶ 11    Officer Carroll Conry of the Chicago police department testified that she was on beat patrol with her partner when they received a call to respond to the West 111th Street residence. When they arrived, Conry saw defendant leaning over Gladney. Defendant's clothes were covered with blood. A large carving knife was lying on the ground.

¶ 12    Officer Reginald Arrington testified that he and his partner also responded to the scene. When they arrived, Arrington observed Gladney lying on the ground bleeding from the right side of his face, and he appeared to be trying to shove defendant away. Arrington saw a butcher knife on the ground about two feet from Gladney. Arrington took defendant into custody and took him to Roseland Hospital. Arrington observed a laceration to defendant's lip and scrapes on his knees.

¶ 13    Dr. Carrie Wilson testified that she treated defendant in the emergency room. Defendant had a superficial laceration to the upper lip and a sore throat. He also had abrasions to both his knees. An X-ray of defendant's neck did not show any bone damage.

¶ 14    Detective Todd Pierce of the Chicago police department testified that at the time of the incident, he was a domestic violence detective. A trail of blood led from the area where Gladney had been lying to the rear basement door. Pierce found blood spatter marks on the sides of the door frame and some drops of blood on the stairs to the basement. There was blood inside the entryway between the door and the rest of the apartment. It appeared the fight started in that entryway at the bottom of the stairs.

¶ 15    The parties stipulated to the testimony of Dr. James Doherty, a trauma surgeon who treated Gladney. Doherty performed surgery to repair Gladney's carotid artery and remove the blood clot. However, Gladney's condition continued to worsen, and he was referred to a neurosurgeon. Gladney was very combative when first brought into the emergency room. He attacked the nurses and the emergency medical technician. He removed the IV from his arm. Gladney's blood alcohol level was 0.19, and he had cocaine in his system. Doherty observed no defensive wounds on Gladney's body.

¶ 16    Over defendant's objection, Officer Conry testified in rebuttal for the State that when she arrived at the scene, she approached defendant and asked what had happened. Defendant said that "somebody" stabbed Gladney.

¶ 17    At the jury instruction conference, the State objected to defendant's tendering of instructions on (1) second degree murder based on serious provocation and on unreasonable belief in self-defense, (2) involuntary manslaughter, and (3) self-defense. The trial court stated its intention to give instructions on self-defense and on second degree murder, unreasonable belief in self-defense. However, the court declined to give a second degree murder, serious provocation, instruction. The court noted that the evidence was uncontradicted that defendant was walking around on the day of the incident with a knife in his hand talking about killing Gladney. The fight was not a spontaneous action on defendant's part. He had been looking to confront Gladney for hours before the event occurred. In addition, the evidence was clear that Gladney did not have a weapon of any kind. The trial court also found the evidence of provocation to be "very, very, very sketchy. I don't know if it rises to a scintilla." The court referred to Davis's uncertain trial testimony concerning whether Gladney had punched

- 4 -

defendant. The testimony did not indicate when, where, or under what circumstances this occurred, only that Gladney and defendant were engaged in a "tussle" over the bicycle when Davis observed them.

¶ 18 The jury convicted defendant of first degree murder. Defendant filed a posttrial motion that did not claim error in the trial court's refusal to give an instruction on involuntary manslaughter. The trial court denied the posttrial motion and, following a hearing, sentenced defendant to 27 years in prison.

¶ 19 Defendant filed a notice of appeal. The appellate court affirmed his conviction. The court rejected defendant's argument that the applicable standard of review for a refusal to give requested jury instructions is *de novo*. The appellate court found that the proper standard is abuse of discretion, and the court determined that the trial court did not abuse its discretion in this case. The appellate court also found that the trial court erred in allowing the State to call Officer Conry in rebuttal, concluding that the State should have elicited her rebuttal testimony in its case-in-chief. However, the appellate court found that the error was harmless. As stated, this court granted defendant leave to appeal.

¶ 20                                                    ANALYSIS
¶ 21                                                        I
¶ 22 Defendant argues that the proper standard of review on the issue of the trial court's refusal to give a requested jury instruction is *de novo*. The State argues that the appropriate standard is abuse of discretion.

¶ 23 First, we determine the quantum of evidence that is required for a trial court to give a jury instruction on a lesser-included offense. We agree with the dissent that this court has at times been less than clear about the standard to be used in determining whether sufficient evidence exists to warrant the giving of a jury instruction (*infra* ¶ 72 (Burke, J., dissenting, joined by Freeman and Kilbride, JJ.)). We have sometimes stated that an instruction is justified if *some credible* evidence exists in the record that would reduce the charged offense to a lesser offense. See, *e.g.*, *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998); *People v. Jones*, 219 Ill. 2d 1, 31 (2006). In other cases, we have stated that an instruction on a lesser offense should be given where the record contains *some evidence* to support the giving of the instruction. See, *e.g.*, *People v. Foster*, 119 Ill. 2d 69, 87 (1987); *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997); *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). As noted by the appellate court in *People v. Willett*, 2015 IL App (4th) 130702, ¶ 71, this has led to confusion.

¶ 24 The phrase "credible evidence" appears to have originated in this court's decision in *People v. Ward*, 101 Ill. 2d 443, 451 (1984). However, the two cases cited by *Ward* in support of the credible evidence standard did not use that standard. See *People v. Joyner*, 50 Ill. 2d 302, 306 (1972); *People v. Canada*, 26 Ill. 2d 491, 491-92 (1962). *DiVincenzo*, 183 Ill. 2d at 249, further confused the issue by using both *some evidence* and *credible evidence* in the same paragraph. *DiVincenzo* cited *Ward* in support but also cited *Foster*, 119 Ill. 2d at 87, in which this court stated that where there is evidence in the record that, if believed by the jury, would reduce a crime to a lesser offense, an instruction on that offense should be given. *Foster*, therefore, does not support *DiVincenzo*'s statement that some credible evidence is required.

¶ 25 We hold that the appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record

that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence. It is not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified. *Lockett*, 82 Ill. 2d at 552-53; *Jones*, 175 Ill. 2d at 132. Requiring that credible evidence exist in the record risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury. *Willett*, 2015 IL App (4th) 130702, ¶ 88.

¶ 26    We now turn to the parties' arguments on the standard of review.

¶ 27    Defendant relies on decisions of this court, namely, *People v. Washington*, 2012 IL 110283, *People v. Everette*, 141 Ill. 2d 147 (1990), and *People v. Lockett*, 82 Ill. 2d 546 (1980), and an appellate court decision, *People v. Viramontes*, 2014 IL App (1st) 130075. In *Washington*, the defendant was convicted of first degree murder. The trial court gave the defendant's requested jury instruction on self-defense but refused to give an instruction on second degree murder, concluding that a question must exist as to whether the defendant's subjective belief in the need for the use of force was reasonable and that there was no evidence that the defendant had an unreasonable belief. The issue before this court was whether the trial court was required to give an instruction for second degree murder due to an unreasonable belief in self-defense once it had determined that sufficient evidence existed to give an instruction on self-defense. This court held that:

> "when the evidence supports the giving of a jury instruction on self-defense, an instruction on second degree murder must be given as a mandatory counterpart. A failure to do so deprives the jury of the ability to make a factual determination as to whether the defendant had a subjective belief in the necessity for the use of force in self-defense but that belief was unreasonable. Our holding applies only in cases, such as *Lockett* and the instant case, where the trial court has determined that the giving of an instruction on self-defense is warranted and the defendant requests the giving of a second degree murder instruction." *Washington*, 2012 IL 110283, ¶ 56.

¶ 28    In describing the standard of review, we stated that "[t]he question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review." *Id.* ¶ 19. *Washington* relied on this court's 1980 decision in *Lockett.* There, the defendant and his friends, who were in the defendant's car, engaged in an argument with a man pulling a cart filled with glass bottles. The man came up to the passenger side and pulled a smoking pipe out of his back pocket. The defendant and his friends laughed. The man then said he had something in his cart that would make the defendant and his friends move. He reached into the cart and pulled something brown out of it. One of the defendant's friends told him to watch out, and the friend ducked. The defendant pulled out a gun and shot the man. Police found no gun on the man but did find an empty brown whiskey bottle lying near the man's body. The trial court gave the jury an instruction on justifiable use of force but refused to give one on voluntary manslaughter (now second degree murder). The defendant was convicted of murder (now known as first degree murder). The State argued before this court that the defendant was not entitled to a voluntary manslaughter instruction based on an unreasonable belief in self-defense where the trial court had determined that the jury could find from the evidence that the defendant had a reasonable belief in self-defense. This court rejected that argument, finding that such an instruction was not precluded. This court found that when the evidence supports giving an instruction on justifiable use of force, a tendered instruction on

voluntary manslaughter should be given. The question of whether the defendant's subjective belief was reasonable or unreasonable is for the jury to decide. This court further stated:

> "We can conceive of no circumstance when a judge could determine, as a matter of law, that a jury could find the defendant had a reasonable subjective belief the killing was justified, but that the jury could not find the defendant's subjective belief was unreasonable." *Lockett*, 82 Ill. 2d at 553.

¶ 29 In stating the standard of review in *Washington*, this court cited its 1990 decision in *Everette*. In that case, the defendant was charged with murder. He claimed that he killed the victim accidentally. The trial court refused a tendered jury instruction on self-defense. This court found error and cited its holding in *Lockett*. The court held that a homicide defendant is entitled to an instruction on self-defense where there is some evidence in the record that, if believed by a jury, would support the defense, even where the defendant testifies that he accidentally killed the victim. *Everette*, 141 Ill. 2d at 156-57. The court then turned to the facts of the case to determine whether the defendant was entitled to an instruction on self-defense. The court noted that, "[i]t is a matter of law whether the defendant has met the evidentiary minimum entitling him to instructions on an affirmative defense." *Id.* at 157.

¶ 30 Defendant here argues that *de novo* is the correct standard of review for a refusal to give a requested jury instruction. In addition to his reliance on *Lockett*, *Everette*, and *Washington*, he relies on an appellate court decision, *People v. Viramontes*, 2014 IL App (1st) 130075. That case involved the trial court's refusal to give the defendant's requested jury instructions on second degree murder based on provocation and involuntary manslaughter. The appellate court stated the standard of review as follows:

> "As a reviewing court, we determine whether the instructions fully and fairly set out the law applicable to the theories of the State and the defense. [Citation.] Whether to give a certain jury instruction falls within the sound discretion of the trial court, and we will reverse its judgment only on an abuse of discretion. [Citation.] The question of the sufficiency of evidence in the record to support a jury instruction, however, is a legal question reviewed *de novo*. [Citation.]" *Id.* ¶ 36.

¶ 31 Defendant argues that *Viramontes* illustrates that a trial court generally has discretion to determine the appropriate jury instructions, but in the limited situation of ruling on lesser offense instructions requested by the defense, the trial court always abuses that discretion by refusing to give the instructions if they are supported by slight evidence. Although he uses the language of abuse of discretion, defendant seems to be arguing that the standard is really *de novo* in lesser offense instruction cases. As an example, he cites this court's decision in *People v. Jones*, 219 Ill. 2d 1 (2006), and attempts to distinguish it from the appellate court decision in this case. In *Jones*, the defendant was convicted of first degree murder. The trial court refused to give a jury instruction on involuntary manslaughter, finding no indication in the evidence that the defendant had acted recklessly. This court noted that the giving of jury instructions lies within the sound discretion of the trial court. An instruction on a lesser offense is justified when there is some "credible evidence" to support the giving of the instruction. *Id.* at 31. Where there is evidentiary support for an involuntary manslaughter instruction, the failure to give the instruction constitutes an abuse of discretion. This court then briefly reviewed the evidence and found a complete absence of any evidence to support an involuntary

manslaughter instruction. This court thus held that the trial court did not abuse its discretion in refusing to give the instruction. *Id.* at 31-32.

¶ 32    Defendant's reading of *Jones* is incorrect. Common sense dictates that, for a reviewing court to determine whether the trial court abused its discretion, it must undertake a review of the relevant evidence. This is necessary because an abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. Rivera*, 2013 IL 112467, ¶ 37. The question is not whether the reviewing court would have made the same decision if it were acting as the lower tribunal. *United States Steel Corp. v. Illinois Pollution Control Board*, 384 Ill. App. 3d 457, 461 (2008). In contrast, *de novo* review does not require the reviewing court to defer to the trial court's judgment or reasoning; it is completely independent of the trial court's decision. Under the *de novo* standard, the reviewing court performs the same analysis that the trial court would perform. *Nationwide Advantage Mortgage Co. v. Ortiz*, 2012 IL App (1st) 112755, ¶ 20. The question is thus whether the trial court's decision was correct as a matter of law.

¶ 33    In *Jones*, this court did not substitute its judgment for that of the trial court. Rather, we found the trial court had not abused its discretion when it determined that there was no evidence of recklessness. *Jones*, 219 Ill. 2d at 32. That this court did not detail the factual findings of the trial court supporting its refusal to give the instruction does not transform our decision into one utilizing *de novo* review. We explicitly stated the standard of review as abuse of discretion. Thus, defendant's effort to contrast *Jones* with the appellate court's decision in this case fails. In both cases, the reviewing courts utilized an abuse of discretion standard of review. As noted above, we reject the "credible evidence" standard utilized in *Jones*. However, this does not impact our analysis on the standard of review.

¶ 34    The appellate court's decision in *Viramontes*, cited by defendant above, erroneously relied on *Washington* when it stated that the question of sufficiency of the evidence to support a jury instruction is a legal question reviewed *de novo*. As we note further in this opinion, *Washington* addressed only a question of law and did not consider whether the trial court had abused its discretion in any way. Thus, we reject defendant's reliance on *Viramontes*.

¶ 35    Defendant confuses the issue by arguing that in *People v. Hari*, 218 Ill. 2d 275 (2006), this court "explicitly applied a *de novo* standard of review in holding that the trial court necessarily abused its discretion in denying instructions on an affirmative defense." This is an inherently contradictory statement. Contrary to defendant's claim, this is not what happened in *Hari*. There, the defendant was charged with first degree murder and attempted first degree murder. He requested a jury instruction on the affirmative defense of involuntary intoxication due to alleged side effects of medication. The trial court found that the evidence did raise the issue of involuntary intoxication, but the court denied the requested instruction on the ground that existing case law required that the involuntary intoxication must be due to "trick, artifice, or force." *Id.* at 289.

¶ 36    The question before this court in *Hari* was whether the defendant's requested instruction was permitted under the language of section 6-3 of the Criminal Code of 1961 (720 ILCS 5/6-3 (West 2014)). As to the standard of review, this court stated that "[o]n the law issues before us, our review proceeds *de novo*." *Hari*, 218 Ill. 2d at 291. We interpreted the statute and found that the drugged condition alleged by the defendant was involuntarily produced within the meaning of the statute. The court then proceeded to determine whether the defendant had

produced "some evidence" that his drugged condition was involuntarily produced and deprived him of the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. In doing so, this court reviewed the evidence at trial on the issue of the side effects of the medication defendant was taking at the time of the incident. The court thus found that the trial court had erred in refusing to give the instruction. *Id.* at 295-96.

¶ 37    Although defendant claims this court applied an "explicitly" *de novo* standard of review in *Hari*, this was true only as to the issue of law regarding whether the language of the statute included the intoxicating effects of medication. As to the trial court's failure to give the jury an instruction on the defendant's affirmative defense, we set forth the familiar standard of abuse of discretion where the trial court refuses to instruct the jury on an affirmative defense and we further stated that this standard applies even if the evidence is conflicting. *Id.* at 296. Accordingly, defendant's reading of *Hari* is inaccurate, and we reject his claim that *Hari* applied a *de novo* standard of review to the question of evidentiary support for the requested instruction.

¶ 38    The State points out that, historically, this court has deferred to the trial court's decision as to whether sufficient evidence supports a particular jury instruction. See *Jones*, 219 Ill. 2d at 31; *People v. Kite*, 153 Ill. 2d 40, 46 (1992) ("It is well settled that on issues of credibility of witnesses, this court will, necessarily, defer to findings of the trial court. [Citations.] Furthermore, a reviewing court will not reweigh the evidence in determining whether an instruction was proper on a certain theory." (Internal quotation marks omitted.)); *People v. Crane*, 145 Ill. 2d 520, 526 (1991) ("A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence [citation], and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury.").

¶ 39    The State argues, and we agree, that *Lockett*, *Everette*, and *Washington* did not apply a *de novo* standard of review to the question of whether the trial court erred in finding sufficient evidence to justify giving an instruction. In each case, the trial court found sufficient evidence to warrant the instruction but found that the instruction could not be given as a matter of law. In *Lockett*, the trial court's reason for refusing the voluntary manslaughter instruction was not because the evidence failed to support such an instruction. The court gave an instruction on self-defense. The question was whether the evidence on self-defense would also support an instruction on voluntary manslaughter. Rather than relying on the evidence, the trial court based its decision on legal principles. This court held that, as a matter of law, the trial court was incorrect and that if the record contains evidence of a defendant's subjective belief, both instructions should be given. *Lockett*, 82 Ill. 2d at 553-54.

¶ 40    In *Everette*, the defendant testified that he shot the victim by accident. He requested jury instructions on both self-defense and involuntary manslaughter. The trial court ruled that the defendant must rely on one defense or the other but could not have the jury instructed on both, because the two defenses were, by definition, inconsistent with each other. The trial court concluded that the evidence supported only an accident defense, and it thus instructed the jury on involuntary manslaughter but not self-defense. This court reviewed the issue as one of law and held that a homicide defendant is entitled to an instruction on self-defense where there is some evidence in the record that, if believed by a jury, would support the defense, even where the defendant testifies that he accidentally killed the victim. *Everette*, 141 Ill. 2d at 156-57.

This court went on to review the evidence to determine whether sufficient evidence existed. In doing so, the court agreed with the trial court's finding that the defendant was not the aggressor, noted that the trial court correctly examined the record for evidence of any physical contact between the defendant and the victim prior to the defendant's use of force, and found that the trial court properly considered the evidence of the defendant's motive in its determination that the evidence did not support an instruction on self-defense. *Id.* at 159-61.

¶ 41 *Washington* reviewed a question of law: whether a second degree murder instruction must be given as a mandatory counterpart to an instruction on self-defense. Hence, this court utilized a *de novo* standard of review. Relying on *Lockett*, this court held that when the trial court determines that sufficient evidence exists in the record to support an instruction on self-defense, an instruction on second degree murder must be given if requested by the defendant. *Washington*, 2012 IL 110283, ¶ 56. While we acknowledge that the choice of wording in explaining the *de novo* standard in *Washington* was less than clear, we emphasize that this court did not utilize a *de novo* standard to review the trial court's decision to refuse to give a second degree murder instruction. The trial court's decision in *Washington* involved a legal question not amenable to an abuse of discretion standard of review.

¶ 42 Thus, we reject defendant's argument that this court did not defer to the trial court's findings in these three cases but rather independently reviewed the facts contained in the record in each case. We hold that when the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion.

¶ 43                                                            II

¶ 44 We now turn to defendant's argument that the trial court erred in refusing to instruct the jury on involuntary manslaughter and second degree murder due to serious provocation.

¶ 45 The State argues that defendant has forfeited review of his jury instruction argument with respect to the refusal of the trial court to instruct the jury on involuntary manslaughter because, although he raised the issues before the trial court, his trial counsel failed to include it in defendant's posttrial motion. Generally, to preserve a claimed error, a defendant must both object at trial and include the issue in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). This court has recognized three exceptions to this requirement. Reviewing courts will review (1) constitutional issues properly preserved at trial that may be raised later in a postconviction petition, (2) challenges to the sufficiency of the evidence, and (3) plain errors. *People v. Cregan*, 2014 IL 113600, ¶ 16 (citing *Enoch*, 122 Ill. 2d at 190).

¶ 46 Defendant relies on the first exception, arguing that the trial court's refusal to instruct the jury on involuntary manslaughter deprived him of due process and his right to a fair jury trial. The State counters that this exception does not apply, relying on *Enoch*, where this court found the defendant's jury instruction argument forfeited. However, the State mischaracterizes the holding in *Enoch*. This court held the jury instruction error forfeited and not subject to the constitutional claim exception because the defendant there failed to request the jury instruction *and* failed to file a posttrial motion. Here, defendant did request jury instructions for involuntary manslaughter and second degree murder, which were refused. He did not include the claimed error as to involuntary manslaughter in his posttrial motion.

¶ 47        Regardless, we need not decide whether defendant's alleged jury instruction error in this case is subject to the constitutional claim exception to the forfeiture doctrine, as the result we reach would be the same under that exception and under plain error review. We therefore review defendant's claim for plain error.

¶ 48        The plain error doctrine permits a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in a plain error analysis is to determine whether error occurred. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). Absent reversible error, there can be no plain error. *People v. Williams*, 193 Ill. 2d 306, 349 (2000). The defendant has the burden of persuasion on both the threshold question of plain error and the question whether the defendant is entitled to relief as a result of the error. *In re M.W.*, 232 Ill. 2d 408, 431 (2009).

¶ 49        Defendant argues that the trial court erred in refusing to instruct the jury on involuntary manslaughter. He maintains that there was some evidence at trial that he acted recklessly in stabbing Gladney.

¶ 50        Involuntary manslaughter is defined as follows:

    "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." 720 ILCS 5/9-3(a) (West 2014).

Recklessness is defined as follows:

    "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2014).

¶ 51        The difference between first degree murder and involuntary manslaughter lies in the defendant's mental state. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). Defendant was charged with two counts of first degree murder. The first count alleged that he intentionally or knowingly stabbed and killed Gladney with a knife. The second count alleged that defendant stabbed and killed Gladney with a knife, knowing that such stabbing created a strong probability of death or great bodily harm to Gladney. "Knowledge" is a conscious awareness that one's conduct is practically certain to cause a particular result. 720 ILCS 5/4-5 (West 2014).

¶ 52        Certain factors, while not dispositive, may be considered in deciding whether an involuntary manslaughter jury instruction is warranted: (1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless. *DiVincenzo*, 183 Ill. 2d at 250-51.

¶ 53    Defendant notes that the appellate court found some evidence that defendant did not intend to kill Gladney, relying on the fact that both men were of similar size, that two of the three stab wounds were superficial, and that the fatal stab wound to Gladney's face was some evidence that defendant did not aim for Gladney's neck. Defendant argues that these findings should have resulted in reversal and remand for a new trial, but the appellate court instead found defendant's case to be similar to *People v. Luna*, 409 Ill. App. 3d 45 (2011). There, the defendant was convicted of murder. He argued that the jury should have been instructed on involuntary manslaughter. He alleged that, rather than intentionally stabbing the victim, he swung the knife recklessly in the victim's direction. The defendant's testimony that he intended only to scare the victim away was the only evidence on that point. The appellate court held that the trial court did not abuse its discretion in refusing to instruct the jury on involuntary manslaughter. The court phrased the primary question as whether there was any credible evidence that the defendant did not intentionally stab the victim but instead swung the knife recklessly in the victim's direction. Utilizing this now-rejected standard, the court concluded that the defendant intentionally swung the knife in the victim's direction and this is all that is required to preclude an involuntary manslaughter instruction. The appellate court discounted the defendant's testimony as to his subjective intent, as it was not supported by any other evidence. *Id.* at 49-50.

¶ 54    Defendant claims that *Luna* is contrary to this court's decision in *People v. Whiters*, 146 Ill. 2d 437 (1992). In that case, the defendant stabbed her boyfriend during an argument. She testified that he pushed her, ripped the phone off the wall, and threatened to "kick her ass." The defendant grabbed a kitchen knife and pointed it at the victim. When the victim moved toward her, she stabbed him in the abdomen. Immediately, the defendant screamed that she did not mean it, and she called for an ambulance. The trial court denied the defendant's request to instruct the jury on involuntary manslaughter. This court affirmed the appellate court, which found that the record contained evidence of acts by the defendant that, if believed by the jury, could reasonably be determined to be reckless conduct. That question was one of fact for the jury, and the trial court erred in refusing to give an instruction on involuntary manslaughter. *Id.* at 441.

¶ 55    Defendant compares his situation to that of the defendant in *Whiters*. He notes that he was upset because he believed Gladney was having an affair. He and Gladney were intoxicated, they argued, and after the stabbing, defendant called for help and said to Gladney, "Please don't die." Defendant further asserts that no one witnessed the beginning of the argument and there was some evidence that Gladney instigated the argument by punching defendant. Defendant points to the testimony of his cousin, Charlotte Davis. She testified at defendant's second trial that she did not see Gladney hit defendant. She then testified that Gladney "probably" hit defendant but she only "took notice" when Gladney cried out and was holding his eye. At defendant's second trial, Davis was confronted with her prior testimony at the first trial and before the grand jury. At those times, she testified variously that she saw defendant and Gladney hitting each other and that Gladney "may" have hit defendant, which "may have started the whole thing with the knife and everything." Davis also testified that defendant had the knife in his hand when he and Gladney were struggling over the bicycle.

¶ 56    As further support for his argument that his actions were reckless, defendant points to the testimony of the medical examiner, who stated that a person who intends to cut the carotid artery would likely aim for the neck, not the face. However, weighing against these factors is

the evidence that defendant had cut Gladney with a knife during an argument several months before the fatal stabbing. In addition, on the day of the fatal incident, defendant, while holding a knife, expressed his belief that Gladney was having an affair and threatened to kill Gladney. We also note the evidence that defendant was armed with a knife during the argument, while Gladney was unarmed. The testimony of Charlotte Davis as to who started the fight was equivocal at best. While she testified that Gladney "probably" hit defendant, her testimony indicated that she was not paying attention to defendant and Gladney until she heard Gladney cry out and saw him holding his hand over his eye. We also note that defendant stabbed Gladney not once but three times.

¶ 57    This case is distinguishable from *Whiters*. There, the victim ripped a phone off the wall during an argument and threatened to beat the defendant. The victim moved toward the defendant as she held a knife at her waist. She stabbed him once, then immediately screamed that she did not mean to hurt him and called for help. Here, defendant was trying to prevent Gladney from leaving by keeping him from taking his bicycle. As they struggled over the bicycle, defendant swung the knife at Gladney, stabbing him three times. There is no evidence that Gladney threatened defendant. The stab wound to Gladney's cheek was deep enough to strike the carotid artery. Defendant was not merely swinging the knife recklessly in Gladney's direction. Given the dearth of evidence of recklessness, we conclude that the trial court did not abuse its discretion in refusing to give a jury instruction on involuntary manslaughter. Since no error occurred, we reject defendant's plain error argument.

¶ 58    Defendant next argues that the trial court erred in refusing to give a jury instruction on second degree murder based upon serious provocation. He asserts that he and Gladney were engaged in mutual combat when the stabbing occurred.

¶ 59    A person commits second degree murder when he or she commits first degree murder and either of two mitigating factors exists. The first factor involves an unreasonable belief in self-defense. The trial court gave a jury instruction on this factor. The second mitigating factor is that at the time of the killing, the offender was acting under a "sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed." 720 ILCS 5/9-2(a)(1) (West 2014). The statute defines "[s]erious provocation" as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9-2(b) (West 2014). The only categories recognized by this court to constitute serious provocation are substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). Mutual combat is a fight or struggle that both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat. *People v. Austin*, 133 Ill. 2d 118, 125 (1989).

¶ 60    In *Austin*, the defendant was convicted of murdering a bus driver. She had attempted to use a student bus pass on a school holiday, which the driver told her she could not do. The defendant asked to remain on the bus. The driver told the defendant to either pay full fare or leave the bus. Failing that, she would be removed. Other passengers testified that as the driver reached for the nearby telephone, the defendant struck her in the face. The driver rose from her seat, and she and the defendant began to exchange blows. The defendant pulled a gun from her waistband, and as the two struggled over the gun, the defendant fired a shot into the floor of the

bus. The fight continued outside the bus, where the defendant shot the driver and fled. The defendant testified that she asked for a transfer ticket, and the driver told her to get off the bus. The defendant attempted to take a transfer ticket and the driver prevented her from doing so by striking the defendant's hand with a CTA transfer punch. The defendant testified that she struck the driver and they fought. The defendant said she thought brandishing the gun would frighten the driver into stopping the fight and that she fired the gun at the floor of the bus for this purpose. The defendant maintained that she did not know how the gun went off the second time and that she did not intend to shoot the driver. *Id.* at 122-23.

¶ 61    The defendant requested a jury instruction on voluntary manslaughter based upon serious provocation. The trial court refused to give the instruction because the defendant had initiated the altercation and the parties had not fought on equal terms, since the defendant used a gun. The appellate court reversed and remanded for a new trial, finding the instruction should have been given. The court found the differing testimony as to who was the aggressor, the similar size of the defendant and the driver, and the injuries suffered by the defendant during the fight to be sufficient evidence of serious provocation to require the giving of the defendant's requested instruction. *Id.* at 123.

¶ 62    This court reversed the appellate court, finding no evidence of mutual combat. The bus driver did not enter the fight willingly, nor was the fight between the defendant and the driver on equal terms. This court noted that one who instigates combat cannot rely on the victim's response as evidence of mutual combat sufficient to mitigate a killing from murder to manslaughter. The defendant admitted that she wrongfully boarded the bus and attempted to wrongfully take a transfer ticket. The driver attempted to prevent this by hitting the defendant on the hand. It was the defendant who initiated the events that led to the shooting, and the driver's response to this cannot be used by the defendant to show that there was mutual combat. This court also noted that the fight was not on equal terms. The emphasis on the relative physical size of the parties is misplaced. Rather, the provocation must be proportionate to the manner in which the accused retaliated. The defendant shot and killed an unarmed woman whose provocation was to speak gruffly to the defendant and strike her on the hand with a transfer punch. Shooting the driver was an act completely out of proportion to the provocation. Thus, this court found there was no mutual combat. *Id.* at 125-27.

¶ 63    Noting the appellate court's reliance on *Austin* in this case, defendant argues that his case is more like the situation in *People v. Leonard*, 83 Ill. 2d 411 (1980). There, the defendant was associated with a nightclub that leased space in a building. The club was evicted for nonpayment of rent. The defendant appeared at the building late one evening to collect items. The victim, a security guard, called the manager and said the defendant had a gun. Witnesses testified that they saw the defendant and the victim emerge from the building struggling over a gun that the defendant was holding by the handle. The victim's hand was on the gun's barrel. The witnesses heard a shot and saw the victim fall back and cough up blood. The victim continued to fight with the defendant until he was no longer able to do so. At that point, the defendant pushed the victim over a banister, and the victim fell about six feet to the ground. The defendant then leaned over the banister and screamed at the victim. The defendant suffered a lacerated lip that required sutures. The victim suffered lacerations to his head and his right hand. The trial court declined the defendant's request to give the jury a voluntary manslaughter instruction. The defendant was convicted of murder. The appellate court reversed and remanded for a new trial, finding error in the admission of the victim's statement

to the manager about defendant having a gun and in the refusal to give a jury instruction on voluntary manslaughter. *Id.* at 414-17, 419-20.

¶ 64    This court concluded that there was evidence of mutual combat. The court noted that it was unknown how the physical injuries to the defendant and the victim occurred. The witnesses testified only to the struggle over the gun. The statements made to the victim after the struggle ended are evidence that the defendant was acting under an intense passion. While the intent to kill may have been formulated prior to the incident, it is equally true that the intent could have arisen during the altercation. The trial court also wrongly excluded evidence of the defendant's physical condition two days after the occurrence. That evidence would have shown that the defendant had a swollen lip, scratches on his face, and bluish discoloration around his eyes. *Id.* at 421.

¶ 65    Defendant's attempt to compare his situation to that in *Leonard* fails. Here, while no one witnessed the beginning of the altercation between defendant and Gladney, there was testimony that on the day of the incident, defendant was walking around holding a knife and threatening to kill Gladney based on his belief that Gladney was having an affair. Thus, defendant was spoiling for a fight before Gladney arrived at the house that evening. Defendant was armed with a knife during the altercation, and Gladney was unarmed. There was no evidence that Gladney attempted to take the knife from defendant. The only injuries suffered by defendant were a superficial laceration on his lip and scrapes on his knees. Gladney, on the other hand, suffered three knife wounds, one of them fatal. He also had abrasions on his left arm and both legs. He had no defensive wounds. Even if, as defendant contends, Gladney did hit him, defendant's response was completely out of proportion to the provocation. We also note the evidence that this was not the first time defendant had stabbed Gladney; some months prior to the incident in question, defendant had stabbed Gladney in the head with a knife during an argument.

¶ 66    Defendant also cites *People v. Robinson*, 189 Ill. App. 3d 323 (1989), and *People v. Phillips*, 159 Ill. App. 3d 142 (1987). In *Robinson*, there was evidence of a violent, heated argument between the defendant and the victim. Two knives were recovered from the scene. One knife was found underneath the victim's body, from which the appellate court concluded that a jury could find that both parties were armed. There was evidence that the victim may have provoked the argument. The appellate court concluded that it was for the jury to determine whether the presence of two weapons plus the other evidence was sufficient to make the homicide voluntary manslaughter rather than murder. *Robinson*, 189 Ill. App. 3d at 350-51.

¶ 67    In *Phillips*, the defendant was convicted of murder for stabbing a supervisor at his place of employment. The defendant testified that he had a knife and went into the supervisor's office with the intent to scare him into stopping harassment defendant claimed he had been subjected to. He stated that the supervisor grabbed the knife and attacked him. The two struggled over the knife before the defendant stabbed the supervisor. The appellate court held that the trial court should have given an instruction on the serious provocation theory of voluntary manslaughter. *Phillips*, 159 Ill. 2d at 148. These two cases are distinguishable from the case at bar. Here, defendant was the only participant in possession of a weapon. There was no evidence of a struggle over the knife. Defendant suffered far less serious injuries than did Gladney. In addition, the fact that defendant tried to keep Gladney from taking the bicycle suggests that Gladney wanted to leave, while defendant continued the fight by preventing him from doing

so. We agree with the trial and appellate courts that there was insufficient evidence of serious provocation to warrant the requested jury instruction. We therefore conclude that the trial court did not abuse its discretion in refusing to instruct the jury on second degree murder based upon serious provocation.

¶ 68                                    CONCLUSION

¶ 69    We hold that the proper standard of review of a trial court's refusal to give a requested jury instruction is abuse of discretion. Because defendant failed to preserve his claim that the trial court erred in refusing to give a jury instruction on involuntary manslaughter, we review the claim for plain error. Having done so, we hold that the trial court did not abuse its discretion in refusing to give defendant's tendered instructions on involuntary manslaughter. Thus, because there was no error, we reject defendant's plain error argument. In addition, we hold that the trial court did not abuse its discretion in refusing to give defendant's tendered instruction on second degree murder based upon serious provocation.

¶ 70    Appellate court judgment affirmed.

¶ 71    JUSTICE BURKE, dissenting:

¶ 72    At various times, this court has held that a trial court's decision as to whether there is sufficient evidence to support the giving of a lesser-included offense or affirmative defense jury instruction is a question of law subject to *de novo* review. See *People v. Washington*, 2012 IL 110283, ¶ 19 (the question of whether sufficient evidence exists in the record to support the giving of a second degree murder jury instruction based on an unreasonable belief in self-defense is a question of law subject to *de novo* review); *People v. Everette*, 141 Ill. 2d 147, 157 (1990) (it is a matter of law whether a defendant has met the evidentiary minimum entitling him to instructions on an affirmative defense); *People v. Lockett*, 82 Ill. 2d 546 (1980) (trial court erred in failing to give voluntary manslaughter—now, second degree murder—instruction). At other times, we have said that where there is sufficient evidence to support the giving of such an instruction, the trial court's refusal to give the instruction constitutes an abuse of discretion. See *People v. Hari*, 218 Ill. 2d 275, 296 (2006) ("where there is some evidence to support an affirmative defense instruction, the trial court's refusal to instruct the jury constitutes an abuse of discretion even if the evidence is conflicting"); *People v. Davis*, 213 Ill. 2d 459, 475-76 (2004) (where some evidence supports the lesser-included [involuntary manslaughter] instruction, the circuit court's failure to give the instruction constitutes an abuse of discretion); *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997) ("A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence, and if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury."). These irreconcilable and inconsistent statements have created confusion regarding the appropriate analysis and standard of review in cases where the trial court has denied proffered instructions on lesser-included offenses, lesser-mitigated offenses, theories of the case, and affirmative defenses. *People v. Willett*, 2015 IL App (4th) 130702.

¶ 73    In this appeal, defendant, Stanley McDonald, asks us to reconcile the conflicting case law and clarify the proper standard when reviewing a trial court's decision to deny a defendant's

requested jury instruction on a lesser-included offense. The State argues, and the appellate court held, that a trial court's decision regarding the giving of such an instruction is reviewed for an abuse of discretion. 2014 IL App (1st) 121009-U. Defendant contends, however, that in situations such as this, the proper standard of review is "*de novo.*" He asks us to apply that standard and find that the trial court erred when it refused to instruct the jury at his trial on the lesser-included offenses of second degree murder predicated on serious provocation and involuntary murder.

¶ 74    The majority begins its analysis by acknowledging that "this court has at times been less than clear about the standard to be used in determining whether sufficient evidence exists to warrant the giving of a jury instruction." *Supra* ¶ 23. After reviewing case law, the majority first concludes that "the appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence." (Emphases in original.) *Supra* ¶ 25. The majority further concludes:

> "It is not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified. *Lockett*, 82 Ill. 2d at 552-53; *Jones*, 175 Ill. 2d at 132. Requiring that credible evidence exists in the record risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury. *Willett*, 2015 IL App (4th) 130702, ¶ 88." *Supra* ¶ 25.

¶ 75    Despite this holding, and without offering any explanation for giving deference to the trial court's assessment of the evidence, the majority rejects defendant's contention that the standard of review is *de novo* and affirms the appellate court's judgment, holding that the standard for reviewing a trial court's refusal to instruct the jury on a lesser-included offense is "abuse of discretion." *Supra* ¶ 42. The majority then affirms defendant's conviction for first degree murder, finding that the trial court did not abuse its discretion when it refused to instruct the jury on second degree murder (provocation) and involuntary manslaughter. *Supra* ¶¶ 57, 67. I disagree, and accordingly, I respectfully dissent.

¶ 76    It has long been the position of this court—and the majority agrees—that a defendant is entitled to a jury instruction on a lesser-included offense if "there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." (Emphasis in original.) *Supra* ¶ 25. See *People v. Wilmington*, 2013 IL 112938, ¶ 47; *People v. Kolton*, 219 Ill. 2d 353, 360 (2006); *People v. Medina*, 221 Ill. 2d 394 (2006); *People v. Hamilton*, 179 Ill. 2d 319 (1997); *People v. Landwer*, 166 Ill. 2d 475, 486 (1995); *People v. Novak*, 163 Ill. 2d 93, 108 (1994). Thus, when deciding whether to give the jury a proffered lesser-included offense instruction, the trial court's sole duty is to determine whether there is *some evidence* in the record to support the giving of that instruction. The quantum of evidence necessary to warrant the giving of an instruction is low. As we said in *Hari*, even "[v]ery slight evidence upon a given theory of a case will justify the giving of an instruction." 218 Ill. 2d at 296.

¶ 77    Moreover, the trial court may not assess the credibility of the evidence. As the appellate court in *Willett* held:

> "If the trial court's own credibility determination were allowed to stand in the way of the jury's being instructed on a lesser-included offense, the court would be usurping the

jury's most basic function. Indeed, at the core of the right to a trial by jury is the understanding that lay jurors might weigh evidence and assess credibility differently than trial judges. However, the 'credible evidence' standard—or any standard, for that matter, which purports to give the court 'discretion' to decide what the evidence does or does not show—invites the court to substitute its own credibility determination for that of the jury. In so doing, the court short-circuits the defendant's right to have his guilt or innocence on *all* applicable charges determined by a jury of his peers." (Emphasis in original.) 2015 IL App (4th) 130702, ¶ 88.

¶ 78    Although the majority agrees that a trial court may not assess the credibility of the evidence, it holds that the standard when reviewing a trial court's decision to deny a proffered lesser-included offense jury instruction is abuse of discretion. The majority finds this standard appropriate because, "historically, this court has deferred to the trial court's decision as to whether sufficient evidence supports a particular jury instruction." *Supra* ¶ 38. However, the majority then cites *People v. Jones*, 219 Ill. 2d 1, 31 (2006), and *People v. Kite*, 153 Ill. 2d 40, 46 (1992), for the proposition that "[i]t is well settled that on issues of credibility of witnesses, this court will, necessarily, defer to findings of the trial court." *Supra* ¶ 38. If, as the majority holds, "[i]t is not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified" (*supra* ¶ 25), what justification is there for the majority's holding that abuse of discretion is the proper standard of review? I can find none.

¶ 79    When reviewing a trial court's denial of a proffered lesser-included offense instruction, the question is the correctness of the trial court's determination that defendant has not presented any evidence that would entitle him to the instruction. See *United States v. Lomax*, 816 F.3d 468, 475-77 (7th Cir. 2016). In answering this question, the reviewing court must independently examine the evidence of record and decide whether it contains any evidence that, if believed by the jury, would support a finding of guilt on the lesser included offense. Because the trial court does not assess the credibility of the evidence, there is no reason for a reviewing court to give deference to the trial court's determination. Thus, a *de novo* standard governs the review of the trial court's determination.

¶ 80    Turning now to the evidence presented in this case, it shows that in May 2004, defendant stabbed Gladney, his paramour, during a physical altercation between the two men. Gladney later died from complications resulting from his stab wounds. Defendant was tried on charges of first degree murder. Count one alleged that defendant intentionally and knowingly stabbed and killed Gladney. Count two alleged that defendant stabbed Gladney, knowing that his actions created a strong probability of death or great bodily harm. At trial, the court found there was some evidence that warranted instructing the jury on self-defense and second degree murder predicated on an unreasonable belief in self-defense but refused defendant's proffered instructions on second degree murder predicated on serious provocation and involuntary manslaughter. Defendant argues that this was error because there was *some evidence* in the record from which the jury could have found him guilty of these lesser offenses. Specifically, defendant argues that an involuntary manslaughter instruction should have been given because the evidence showed that the stabbing took place during an altercation between two men of similar size, two of the stab wounds were superficial, and the fatal stab wound to Gladney's face was unusual and not indicative of an attempt to kill. Furthermore, defendant pointed out that the evidence showed that he was upset with Gladney because he believed Gladney was having an affair, that both he and Gladney were intoxicated, and that immediately after

Gladney was stabbed, defendant called for help and implored Gladney to "please don't die." Thus, defendant argues that there was some evidence from which the jury could have found that he did not intentionally kill Gladney.

¶ 81    The majority acknowledges this evidence but states,

> "weighing against these factors is the evidence that defendant had cut Gladney with a knife during an argument several months before the fatal stabbing. In addition, on the day of the fatal incident, defendant, while holding a knife, expressed his belief that Gladney was having an affair and threatened to kill Gladney. We also note the evidence that defendant was armed with a knife during the argument, while Gladney was unarmed. The testimony of Charlotte Davis as to who started the fight was equivocal at best. While she testified that Gladney 'probably' hit defendant, her testimony indicated that she was not paying attention to defendant and Gladney until she heard Gladney cry out and saw him holding his hand over his eye. We also note that defendant stabbed Gladney not once but three times." *Supra* ¶ 56.

¶ 82    It seems that the majority concedes that there is *some evidence* that the stabbing was not done with an intent to kill. However, it then does exactly what it held the trial court could not do—it weighs the evidence against other evidence of record. The majority fails to apply the standard that it holds is the appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense—whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense.[1]

¶ 83    I would find error in the trial court's refusal to instruct on involuntary manslaughter. As the majority explains, the difference between first degree murder and involuntary manslaughter lies in the defendant's mental state. To prove murder, the State is required to prove that defendant acted *intentionally*, *knowing* that there was a strong possibility that his conduct would cause death or great bodily harm. Involuntary manslaughter, on the other hand, is an unintentional killing where the conduct that caused death was performed *recklessly*, that is, with a conscious disregard of a substantial and unjustifiable risk that the actions would cause death. 720 ILCS 5/9-3(a), 4-6 (West 2014).

¶ 84    It is clear to me that defendant presented some evidence from which the jury could find that he did not intentionally kill Gladney. Evidence presented at trial indicated that defendant was upset with Gladney because he believed Gladney was having sex with other people. Gladney returned to the apartment he shared with defendant around 4 p.m., and the two men spoke without incident. However, Gladney left and did not return to the apartment until about 10 p.m., when an argument ensued. Defendant did not want Gladney to be able to leave again, so he grabbed Gladney's bike to prevent that from happening. The two men then engaged in a struggle over Gladney's bike. There was some evidence that Gladney struck defendant in an effort to get him to release the bike and that defendant then lashed out at Gladney, trying to prevent Gladney from getting the bike. There was also evidence that defendant was devastated

---

[1]Arguably, the majority is not even applying its own standard of review, since it holds that a defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence and, if there is such evidence, it is an abuse of discretion for the trial court to refuse to so instruct the jury. *Supra* ¶ 38.

when he discovered that Gladney was severely injured. Defendant cried out for help and begged Gladney not to die.

¶ 85    Defendant argues that "[t]he jury was asked to choose between two competing theories which were supported by the evidence. The failure to provide the jury with the [involuntary manslaughter] instruction deprived defendant of a fair trial." I agree and, for that reason, would find that the trial court erred when it refused to instruct the jury on involuntary manslaughter.

¶ 86    The other instruction that the trial court refused to give was second degree murder based on provocation. To decide whether the trial court erred in refusing to give this instruction requires a review of the record to determine whether there is any evidence of provocation. The only recognized categories of serious provocation are physical injury/assault, mutual quarrel or combat, illegal arrest, or adultery with the offender's spouse.

¶ 87    In this case, defendant claimed provocation based on mutual quarrel. Thus, to warrant an instruction on provocation, the defendant had to present some evidence that he and the victim engaged in "mutual quarrel" or combat as defined by law. Mutual combat has been defined as "a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results." *People v. Austin*, 133 Ill. 2d 118, 125 (1989).

¶ 88    Here the evidence showed that, on the day of the stabbing, defendant had been upset with Gladney much of the day. Defendant's cousin, Charlotte Davis, testified that defendant was upset because he believed Gladney was having "an affair" with someone else. As noted earlier, there was also evidence that, on the evening of the stabbing, Gladney returned home at about 4 o'clock, at which time Gladney talked with defendant and then left again on his bike. At around 10 p.m., Gladney returned home again. Both defendant and Gladney had been drinking that day, and Gladney was also under the influence of cocaine. Upon Gladney's return, the two men engaged in a heated argument and scuffle, instigated by the fact that defendant was trying to bring Gladney's bike into the basement apartment to prevent Gladney from leaving again. Although no one saw how the fight began, Davis heard the two men struggling over the bike on the stairs leading to their basement apartment. There was testimony that Gladney was angry with defendant and told him not to "mess" with his bike. Also, there was evidence that, after the struggle and defendant was taken into custody, he was taken to the hospital, where he received medical treatment for a split lip and other abrasions. These injuries were some evidence that Gladney hit defendant, which supports defendant's claim of mutual combat. Importantly, the trial court believed this evidence was sufficient to support giving the instruction on self-defense and unreasonable belief in self-defense.

¶ 89    As the two men fought over the bike, Gladney was stabbed by defendant. Two of the three stab wounds suffered by Gladney were superficial. Although the third was not, the medical examiner testified that the third wound, which eventually caused Gladney's death, was unusual in that the wound was to Gladney's face and the knife struck the carotid artery—something that one would not have expected to occur with a facial wound. There was no testimony about the manner in which the wound was inflicted, and there was no evidence to show that, at the time of the stabbing, defendant was intentionally trying to harm Gladney. From the evidence presented, the jury could have found that the stab wounds occurred accidentally in the course of the struggle over the bike.

¶ 90    I note, too, that when the trial court refused to give the instruction on second degree murder/provocation, the court said the evidence of provocation was "very, very, very sketchy. I don't know if it arises to a scintilla." Also, the appellate court, after reviewing all of the evidence regarding provocation stated:

> "[W]hile a different judge or even we ourselves may have reached a different ruling, we cannot say that the trial court abused its discretion in declining to instruct the jury on mitigation due to mutual combat." 2014 IL App (1st) 121009-U, ¶ 58.

¶ 91    From the comments quoted above, it appears that both the trial court and the appellate court found "some evidence" of provocation had been presented at trial. After all, the trial court found sufficient evidence of mutual combat to warrant instructing the jury on self-defense and unreasonable belief in self-defense. Thus, I would find that some evidence was presented to warrant an instruction on second degree murder (provocation) and, therefore, the trial court erred when it refused to instruct the jury on that offense.

¶ 92    The majority, when considering whether a second degree murder/provocation instruction should have been given, merely distinguishes the cases cited by defendant. It only discusses the evidence as it related to these other cases. The majority then concludes that the trial court did not abuse its discretion because "there was insufficient evidence of serious provocation to warrant the requested jury instruction." The majority, however, does not apply the standard it earlier found to be appropriate—the majority never considers whether there is some evidence, even if very slight, from which the jury could have found defendant guilty of the lesser offense.

¶ 93    In sum, I cannot join the majority's determination that abuse of discretion is the proper standard for reviewing a trial court's decision to refuse a lesser-included offense instruction. The majority agrees that, when deciding whether there is *some evidence* in the record to support the giving of a lesser-included offense instruction, the trial court may not assess the credibility of the evidence. That being so, why should the trial court's determination be given any deference? The majority offers no explanation. I also do not agree with the majority's finding that the instructions proffered by defendant were not warranted by the evidence. The majority, rather than apply the proper standard and determine whether there was *some evidence* to support the giving of the instruction, does exactly what it said the trial court is not supposed to do—it weighs the evidence. In this way, the majority usurps the function of the jury and, thereby, demonstrates a lack of confidence in the jury's ability to fulfill its role. Accordingly, I dissent.

¶ 94    JUSTICES FREEMAN and KILBRIDE join in this dissent.